IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 13, 2013

## STATE OF TENNESSEE v. CURTIS MOORE

**Appeal from the Criminal Court for Shelby County**
**No. 10-04087     J. Robert Carter, Jr., Judge**

_____

**No. W2013-00179-CCA-R3-CD  - Filed February 4, 2014**

_____

A Shelby County jury convicted the Defendant, Curtis Moore, of attempted second degree murder, employing a firearm during the commission of a dangerous felony, and aggravated assault.  The trial court merged the aggravated assault conviction with the attempted second degree murder conviction and ordered the Defendant to serve an effective sentence of fourteen years.  On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction for attempted second degree murder and that the trial court erred when it found him statutorily ineligible for probation.  After a thorough review of the record and applicable authorities, we conclude that the evidence is sufficient to sustain the Defendant's conviction.  We further conclude, and the State concedes, that the trial court erred when it found the Defendant statutorily ineligible for probation.  As such, we reverse the case for the trial court to consider the Defendant's suitability for probation on the eight-year sentence for attempted second degree murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Marvin Ballin, Memphis, Tennessee, for the appellant, Curtis Moore.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Carla Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from an altercation that occurred between the Defendant and his wife, the victim. A Shelby County grand jury indicted the Defendant for one count of attempted first degree murder, employing a firearm during the commission of a dangerous felony, and aggravated assault.

## A. Trial

At the Defendant's trial, the following evidence was presented: Nanette Jefferson, the victim, testified that she met the Defendant, who was a prison guard, while she was working as a nurse in a jail infirmary. The victim estimated that the two met in February 2004 and that they dated for a year before getting married. After their marriage, the victim moved into the Defendant's home in Shelby County. In January 2010, after almost five years of marriage, the two were in the midst of a divorce proceeding, but they were still living together.

The victim described the events that occurred on January 18, 2010. She said she was in her bed asleep when she awoke shortly after 10:00p.m. and decided to go to the kitchen to get a drink. She noticed that the Defendant, who was not home when she fell asleep, was in the den sitting beside the computer. The victim said she asked the Defendant what he was doing or what he was looking at on the computer, but she could not specifically recall. She did recall that she asked him to turn the alarm on if he left the house again. The Defendant responded to her in an angry manner, and the victim told him that she was not going to argue with him because her lawyer had told her that the two could stay in the home together as long as there was not an "aggressive situation." She recalled that this comment incensed the Defendant and, as the victim was walking away, the Defendant said, "I'm about sick of you and your damn lawyer. I think I'm going to kill you."

The victim said that, when the Defendant said this, she turned and looked at him because she thought he was "playing." She then saw him moving his black 9 mm gun, which was at his side. The victim said she started running to her room because she realized he was serious. The victim fell after running down the hallway to her bedroom. She rose and tried to close the bedroom door. The Defendant was on the other side trying to push the door open. The victim recalled saying to the Defendant, "[P]lease let's talk about this," in an attempt to calm him down. The Defendant kept saying, "I'm going to kill you." The Defendant, who was unable to fully push open the door, reached his arm in through the opening and shot the victim.

The victim testified that she did not realize at first that she had been shot. She then felt the pain and said to the Defendant that he had shot her. The Defendant said "yes [I] did" and that he was going to call 911 and then shoot her again to kill her. The victim said that she tried to calm the Defendant down, telling him that they could talk about the situation and

work it out.

The victim testified that she became weak from the loss of blood from the bullet wound and that the Defendant dragged her down the hallway into the family room. The victim looked around trying to find an object with which to defend herself. She grabbed a large wooden candle holder from a side table. The Defendant, who was standing over her while she was lying on the ground, told her to drop the candle holder and turn over so he could shoot her. The victim refused, saying that she would drop it only if he put down his gun. The Defendant then ran outside. The victim ran back to the bedroom, locked the door, and then ran into the bathroom located inside the bedroom and locked that door also. She then called 911.

The victim said that she only exited her bedroom when emergency personnel responded. The police arrived first, and officers kept her calm until the paramedics arrived. The victim said that, during this time, she was holding a towel to her chest where she had been shot. When paramedics arrived they transported the victim to the hospital, where she was in the intensive care unit for three days. She remained in the hospital for a total of seven days.

The victim said that, at the hospital, she learned that the bullet had entered her left breast and exited her lower torso. She had to undergo surgery on her abdomen. The victim said she had to have a second surgery a year later. She was still suffering problems with "keloid skin" and the pain.

During cross-examination, the victim testified that the Defendant called the police on a prior occasion after the two had a "misunderstanding." She said that no one was arrested on that occasion. She stated that was the only occasion when police were called before she called 911 on the day of the shooting. The victim agreed that, after they filed for divorce, the Defendant had accused her of seeing one of his friends. They also argued about her withdrawing money from his bank account.

The victim testified that she had been to work the day of the shooting and had returned home at around 5:00 p.m. She had fallen asleep by the time the Defendant returned home. The victim agreed that there was no blood on the floor where the Defendant had dragged her out of the bedroom after he shot her. She guessed that he used a robe she was wearing to stem the flow of blood from her wound.

Terrie Leborgne, a 911 dispatcher, testified that she was the keeper of records for the 911 recordings. She offered two recordings of phone calls from the night of the shooting, one call from the victim and one from the Defendant. These recordings were played for the jury.

Quentin Hogue, with the Memphis Police Department, testified that on January 19, 2010, he responded to a 911 call from the address where the victim and the Defendant resided. He said that while en route to the address, he learned that the call involved a shooting with the shooter still at the scene. As police procedure required, Officer Hogue waited for his partner to arrive before he approached the address.

Officer Hogue testified that, while waiting for his partner to arrive, he observed the Defendant exit the house holding a gun. The officer told the Defendant to put the gun down and come toward the officer. The Defendant placed the gun on the back of a vehicle and complied with the officer's orders. Officer Hogue testified that he handcuffed the Defendant, who said, "I shot my wife. She's inside." Shortly thereafter, Officer Hogue's partner arrived, and Officer Hogue informed his partner that there was a shooting victim inside the residence.

Officer Hogue said that he placed the Defendant in the back of his car and that he began working on a report of the incident. The Defendant said that he worked for the "city" and that "this [was] going to mess up his job." The Defendant told Officer Hogue that the Defendant and his wife had been having a "rough time." The Defendant explained that he was at his computer and that his wife had said she was going to kill him. The Defendant said, in response, that he turned around and shot her. The Defendant also told the officer about an affair that his wife might have been having with one of his friends.

During cross-examination, Officer Hogue described the Defendant as "upset." The Defendant said that he had caught his wife sleeping with his best friend. Officer Hogue said he did not see any blood on the Defendant's hands.

David Clemons, an officer with the Memphis Police Department, testified that he responded to this call as Officer Hogue's partner. When he arrived, Officer Hogue informed him that the Defendant's gun was on the trunk of the car, and Officer Clemons secured the weapon, a Ruger P95 handgun.

Lee Thomas, a fire fighter and paramedic with the Memphis Fire Department, testified that he responded to the 911 call. When he walked into the victim's house, he found her lying on her back on the couch, with her head close to the door in which he entered. He described the victim as "[r]eal calm." He asked her where she had been shot, and she pointed to her left breast. Mr. Thomas saw gunshot wounds in two areas near the victim's left breast and another near her abdomen. Mr. Thomas said that he transported the victim, whose injuries were "critical," to the hospital. He recalled that there was only a small amount of blood.

During cross-examination, Mr. Thomas clarified that the victim had one gunshot wound to her left breast, and there appeared to be an exit wound below her left breast. Mr.

Thomas described a second gunshot wound to the victim's abdomen, and he said that, when he transported her, he believed that there was still a bullet in her abdomen.

Gerald Paige, an officer with the Memphis Police Department, testified that on January 19, 2010, he investigated the crime scene in this case. When he arrived at the victim's address, he sketched the scene and took photographs. Officer Paige testified about the photographs, including some that depicted blood and what appeared to be "blood swipes" on the walls of the hallway. The officer identified a photograph of the gun and said that there appeared to be blood on the gun.

Officer Paige testified that, after leaving the crime scene, he went to the hospital where the victim had been transported. There, he recovered a bloody towel, table cup holder, a dress, and a multi-colored shirt.

During cross-examination, Officer Paige testified that the blood "swipe" in the hallway could have come from either the Defendant's or the victim's hands. Officer Paige testified that he saw and photographed a red robe at the scene, in the den, but he did not note any blood on the robe.

On redirect examination, Officer Paige said he might not have noticed red blood on the bottom of the robe.

Clarence Sparks, a detective with the Memphis Police Department, testified that he worked with the felony response unit at the time of this shooting. He participated in the investigation of the Defendant. He said that he spoke with the victim briefly at the hospital before she went into surgery. The only details that she told him were that she and the Defendant had engaged in an argument during which the Defendant had shot her.

Detective Sparks testified that, as part of his investigation, he read the Defendant his *Miranda* warnings and then interviewed him. The Defendant gave a statement in which he said that he and his wife had been involved in an altercation involving a weapon. He described the incident as follows:

> I made it home about 10:20 p.m. I changed clothes. I went to the store. I got me a pack of Bud Light. I came back. I wanted me some food. I sat down in my den and opened my Bud Light and I started eating my dinner. I finished eating my dinner. I got on the computer. My wife was in the back bedroom at the time. The hallway door was closed at my back when I sat down to the computer. All of the sudden the hallway door came open and I heard the words motherfucker, I'm going to get you. And then I felt a hand on my neck. I turned around. It appeared that something was in her hand. As I turned, I was drawing my weapon at the same time. At that time she had her

hands on my left shoulder.

I had my hand on her left shoulder. My weapon was in my right hand as I turned. She was pulling me down the hallway. My weapon was in my right hand. It went off as she was pulling me through the hallway door. I was trying to pick her up. As she got up and she reached for the lamp stand or something on the table and at that time I turned and ran out the door. She ran in the living room area. After that I was calling the police. She ran to the back. I was outside and the Memphis Police Department were coming up the street. When I saw MPD lights I unloaded my weapon, locked the slide back and took the clip out and laid it on the back of my wife's car. I immediately laid on the ground when I saw MPD coming up there with my hands behind my back. They cuffed me and put me in the car.

The Defendant informed the officer that the discharge of his weapon was an accident. The Defendant said that he did not mean to shoot the victim but that he only meant to scare her. The detective identified photographs of the Defendant from that evening, which showed blood on the lower part of the Defendant's sweat shirt, and on his pants from his knee to his ankle on his left side.

During cross-examination, Detective Sparks testified that the victim never told him that she had armed herself with a candle holder during the altercation. The detective discussed interviewing the Defendant, saying that the two talked for several minutes before the detective asked the Defendant questions in the presence of the typist. He confirmed that the Defendant had said that he never intended to hurt his wife and that he had only intended to scare her. The Defendant told him on more than one occasion that he was afraid at the time that he discharged his weapon. The detective described the Defendant as nervous, and the detective said that the Defendant repeatedly said that the shooting was an accident.

For the Defendant, Aniko Moore, the Defendant's thirty-five-year-old daughter, testified that she lived with her mother and the Defendant until they divorced when she was ten or eleven years old. She and the Defendant had maintained contact after the divorce, and Ms. Moore described their relationship as "close." Ms. Moore testified that the Defendant was loving, protective, and intelligent. She said her father was never violent with her, her siblings, or her mother.

Ms. Moore testified that in late 2009 or early 2010, the Defendant came to visit her. The Defendant appeared tired and said he wanted to get some rest. The Defendant stayed at Ms. Moore's house, sleeping, until 3:00 a.m. or 4:00 a.m. When the Defendant was leaving, Ms. Moore told him that she knew that something was not right, and asked what was wrong. The Defendant told her that he did not feel like he could rest at home and that he was afraid to go home.

Gerald Green testified that he had known the Defendant for more than twenty years, and Mr. Green agreed that the Defendant had a reputation for peace and quietude. During cross-examination, Mr. Green stated that he would not change his mind about the Defendant's reputation even if he learned that the Defendant had shot his wife and threatened to kill her.

Angela Moore, the Defendant's ex-wife, testified that she had known the Defendant for between thirty and thirty-five years. The two had three children together and had been divorced for approximately twenty years. Ms. Moore testified that the Defendant had a good reputation in the community and that he had a reputation for truthfulness and veracity.

Vicky Joyner, a sergeant with the Shelby County Division of Correction, also testified about the Defendant having a good reputation in the community. During cross-examination, Sergeant Joyner testified that she and the Defendant had worked together since 1992. She conceded that she was not at the Defendant's house during the shooting and did not know what had happened there.

The Defendant testified that he was a sergeant with the Shelby County Division of Correction. He said that he was responsible for supervising other officers. He was also employed for a number of years as a reserve deputy for the Shelby County Sheriff's Department. The Defendant said that he had a weapon for work and, when not working, he carried a 9mm P95 Ruger.

The Defendant said that, around the time of the shooting, he and his wife were in an argument because it appeared to the Defendant that his wife had lost interest in their marriage. The victim told him that she was having an affair with another man. He said that she would invite men into their home while he was not present. The Defendant said he filed for divorce but then withdrew the filing in an attempt to reconcile. The attempt to reconcile was unsuccessful, and the two argued several times. During these arguments, the victim would spit in his face and throw things at him. The Defendant said that both he and the victim had filed for divorce. The two lived in a home that belonged to him, and he had owned it before they got married.

The Defendant discussed the events of the shooting saying that he returned home from work at around 10:20 pm. He changed his clothes and "put [his] weapon on." He then went back out to purchase a six-pack of Bud Light. The Defendant returned home, ate his dinner, and began using the computer. The Defendant said that he drank only one can of beer and was looking at motorcycles on "YouTube." The victim came out of her bedroom while he was on the computer and went to the kitchen for a glass of water. The Defendant testified that, ten minutes later, he heard the victim say, "[M]otherfucker, I'm going to get you," and she hit him across his left shoulder. He said she also told him that she was going to "sleep with who[mever] [she] want[ed] to." After being hit, the Defendant turned and drew his

weapon. As he did so, he saw a candle holder in the victim's hand. He described the candle holder as a "pretty good size" and made of wood. The victim had her hand on his left shoulder pulling him down the hallway. When they got inside a door in the hallway, he had his weapon in his right hand. He said that, while the two were struggling, his weapon went off and hit her in the chest area.

The Defendant testified that he immediately tried to help the victim, imploring her to lie down. He said that his hands and pants became bloody when he was attempting to render aid to the victim. The victim would not allow him to help her, so he called 911. The Defendant said that the blood on the walls of the hallway was from his hands. The Defendant reiterated that he had not intended to kill the victim that evening and that he could have easily done so had he intended to kill her. The Defendant said that, when the victim hit him, he was in fear for his life. He said he did not put his finger on the trigger; rather, his finger hit the trigger when she was pulling him down the hallway.

The Defendant offered a picture taken of his shoulder four days after the shooting. He said the photograph depicted the injury he received when the victim hit him with the candle holder. He explained that he did not tell police about this injury because he was "highly upset" at the time that he spoke with the officers.

During cross-examination, the Defendant testified that, as part of his employment, he was trained in using weapons. In his training, he learned not to put his finger on the trigger of his weapon until he was ready to shoot. The Defendant said that he owned several guns. He said that he kept the one used in this shooting under the mattress in the room in which he slept. Because the situation between he and the victim had "heated up, [he] took some of the guns out of the house."

The Defendant testified that the victim first hit him and then dragged him down the hall. He did not recall his finger being on the trigger of the weapon, and he said the gun fired accidentally. After the shooting, he got his glasses so that he could see to call 911. He said he could be heard on the 911 tape telling the victim to lie down, and he said he did so hoping that she would not be injured further.

On redirect examination, the Defendant testified that the gun he had the night of the shooting had a "hair" trigger, meaning that a person did not have to apply much pressure to the trigger to discharge the weapon. The Defendant said he and the victim were in the hallway struggling over the weapon when she was shot. He said he pulled his weapon to ensure his own safety and that he never intended to injure the victim.

Based upon this evidence, the jury convicted the Defendant of the lesser included offense of attempted second degree murder, employing a firearm during a dangerous felony, and aggravated assault.

## B. Sentencing

At the Defendant's sentencing hearing, the following evidence was presented: The victim testified that the shooting had affected her emotionally and mentally. She said that she was always afraid and could hardly rest. Her body, she said, was healed but she was still "scattered" both emotionally and mentally. She said that she had seen a psychologist for four to five months for her emotional issues. The victim said that she had also suffered physical problems and undergone a second surgery to repair damage to her abdomen. The victim said that she had healed from that surgery but that she had to be careful lifting, bending, or exercising. The victim said she could also eat only small portions of food at meals because of the damage to her abdomen. If she ate more than a small portion, she would be in pain. She said she would suffer these effects for the duration of her life. The victim said that this had affected not only her life but the lives of her children, one of whom was under eight years old. The victim then read a statement to the trial court.

During cross-examination, the victim said that it had been about a year since she had met with a psychologist for her injuries. She said she saw the psychologist twice a month because that was all her insurance would cover. The victim said that she had resumed working.

The Defendant then made a statement to the trial court expressing remorse and saying that he did not intend to shoot the victim.

The trial court then sentenced the Defendant, finding:

Well, here's the situation in a nutshell to me. And I have to consider and I will outline what all I have considered and am considering.

But first and foremost, something you said struck a nerve there, [defense counsel]. You stated that this is an aberration and I would agree with you. It is an aberration in the life of Mr. Curtis Moore. It is not an aberration in Memphis, Shelby County, Tennessee where way too many disputes of any sort and, particularly, disputes of a domestic sort are settled by violent means and sometimes with the use of deadly weapons and sometimes with drastic consequences.

So it's not an aberration, unfortunately, in our society. It is certainly out of character for Mr. Moore and it was not something that we would have expected. Nevertheless, we're faced with dealing with it.

Under the law, I have considered the testimony at the trial, I've

considered the presence report, the testimony here at the hearing, the statements of both counsel. And in looking at this matter, in essence, going through the guidelines required of me, Mr. Moore is a range one standard offender as to the attempted murder second charge.

And let me go ahead and say it. The aggravated assault charge, I have accepted the jury's guilty verdict. I do find him guilty of that. I'm going to fix the minimum three year sentence on it, but I'm ruling as a matter of law it is merged with count one. It is not a separate set of circumstances, so it is merged into count one.

And my judgment sheet will reflect that, but I am told that you have to fix a sentence and then merge it, as opposed to just ruling it as merged. So I have.

The trial court found that one enhancement factor applied, that there was an injury inflicted upon the victim that was particularly. *See* T.C.A. § 40-35-114(6) (2010). He noted that the victim was "terribly injured and continues to have to make . . . gains to recover from that [injury]." In mitigation, the trial court noted that the Defendant had no prior criminal history, that he was employed, and that he had some mental issues. The trial court noted that the Defendant's sentences were required by statute to run consecutively. The trial court, considering these factors, sentenced the Defendant to the minimum sentence, which was eight years for the attempted second degree murder conviction and to six years for the employing a firearm during the commission of a dangerous felony. The trial court noted that those sentences are statutorily required to run consecutively, and imposed a total effective sentence of fourteen years. The trial court found that, based upon a fourteen-year sentence, the Defendant was statutorily ineligible for probation.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction for attempted second degree murder and that the trial court erred when it sentenced him.

## A. Sufficiency of Evidence

The Defendant contends that the evidence presented at trial is insufficient to sustain his conviction for attempted second degree murder. He asserts that he did not have the requisite *mens rea* because he did not knowingly commit this crime but rather committed the shooting in a state of passion. He alternatively contends that the shooting was an accident. The State counters that the evidence viewed in the light most favorable to the State proves the Defendant's guilt beyond a reasonable doubt.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d

274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

"Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A § 39-11-302(b). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2).

The Defendant first contends that he did not have the requisite mental state to support his conviction because he acted in a state of passion. The evidence in the light most favorable to the State proves that the victim went past the Defendant on her way to get a drink. On her way back, she asked the Defendant about the house alarm. The two began to argue, and the victim told the Defendant she was not going to argue with him because her lawyer told her that the two could reside in the house as long as the situation was not aggressive. This comment incensed the Defendant who said he was sick of the victim and "her damn lawyer." The Defendant threatened to kill the victim and reached for his gun. The victim fled, falling in the hallway of their residence. The victim reached the bedroom door and attempted to close it, but the Defendant was pushing on the other side of the door, preventing the victim from fully closing the door. He then reached his arm through the opening of the door and shot the victim.

The jury heard the Defendant's testimony that this argument stemmed from an alleged affair that the victim was having with the Defendant's best friend. The victim denied any such affair and said that, while the Defendant had accused her of an affair three weeks before the shooting, that was not the cause of the argument the night of the shooting. The jury, by its verdict, did not accredit the Defendant's claim that he committed this shooting in a state of passion produced by adequate provocation. "[W]hether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury." *State v. Williams*, 38 S.W.3d 532, 538 (Tenn. 2001) (quoting *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995)). The jury did not err when it rejected the Defendant's claim, and the evidence supports the jury's verdict.

In the alternative, the Defendant contends that he did not have the requisite mental state to sustain the conviction because the shooting occurred "unexpectedly, unintentionally, and/or by chance." By its verdict, the jury accredited the victim's testimony that the Defendant threatened to kill the victim, chased her down the hallway, and then reached

around the door and shot the victim. While the Defendant testified that the shooting was an accident, the jury did not weigh the evidence in favor of this claim. The evidence presented is sufficient to support the jury's verdict that the Defendant acted knowingly when he shot the victim.

## B. Sentencing

The Defendant next contends that the trial court erred when it concluded that he was statutorily ineligible for probation. He asserts that the trial court could have considered probation for his sentence for attempted second degree murder. The State concedes that the trial court erred but only as to the first count, attempted second degree murder. It asks this Court to remand the case to the trial court to consider the Defendant's suitability for probation on the eight-year sentence for attempted second degree murder.

During the sentencing hearing, the trial court found:

> As to the question of probation, I do not find him to be eligible for probation. . . . Were this two, two-year sentences or two, three- year sentences or something, I would agree that I would have the authority to at least consider suspending a portion of it.

> But . . . 39-17-1324 speaks specifically to the consecutive count, count two, which may not be reduced in any way. [It] can't be Community Corrected, can't be probated. He can't even get on release status offenses. [sic] And so it's ludicrous for me to think . . . that the Legislature intends us to sentence someone to that and then suspend the other portion of it.

> But the other one, just plain statutory construction. My understanding of the law and I'm finding this to be a fact, it's not an eight-year sentence and a six-year sentence. When a consecutive sentence is mandated either in the Court's discretion or by law, which it is in this case, it's a 14-year sentence to the Department of Corrections may not be probated, may not be Community Corrected.

> So I'm not finding that he's a good candidate or a bad candidate for probation. I'm finding that he is statutorily ineligible for probation.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence and the manner of service of that sentence. In *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012), the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by

the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

A defendant is eligible for an alternative sentence if the sentence actually imposed is ten years or less, and the offense is not specifically excluded from probation consideration. T.C.A. § 40-35-303(a) (2010). Our Supreme Court has held that a defendant with a total effective sentence greater than ten years is still eligible for probation if the individual sentences imposed for the convictions fall within the probation eligibility requirements. *State v. Langston*, 708 S.W.2d 830, 832-33 (Tenn. 1986).

The Defendant herein was convicted of attempted second degree murder, a Class B felony. *See* T.C.A. §§ 39-13-210(c), 39-12-107(a). His sentencing range, as a Range I, standard offender, was eight to twelve years. T.C.A. § 40-35-112(a)(2) (2010). The Defendant was also convicted of employing a firearm during the commission of a dangerous felony. This conviction is subject to a mandatory minimum sentence of six years. T.C.A. § 35-17-1324(H)(1). As noted by the trial court, this sentence must be served consecutively to any other sentence imposed and is ineligible for probation by statute. T.C.A. § 35-17-1324(e)(1), (2).

Although the mandatory six-year sentence for the employing a firearm during the commission of a dangerous felony is not probatable, the eight-year sentence for attempted second degree murder is probatable under the law as it is currently written. Accordingly, we remand the case for the trial court to consider the Defendant's suitability for probation for his eight-year sentence for attempted second degree murder.

### III. Conclusion

Based on the aforementioned reasoning and authorities, we affirm in part, reverse in part and remand the case for the trial court's consideration of the Defendant's suitability for probation on his eight-year sentence.

_____
ROBERT W. WEDEMEYER, JUDGE